And we'll hear argument next in Castillo v. G&M Realty, 18-498 and 18-538. Mr. Ketterer. Thank you, Your Honor, and may it please the Court, The District Court erred in multiple ways in this case when it awarded nearly $7 million in damages for the defense painting over works of wall art that even the plaintiff's own expert had never heard of before this lawsuit. I want to address three basic points today. The first is that the District Court misinterpreted what VARA requires really in a host of ways in a way that vastly expanded the scope of the statute and would really have made the whole five-point enterprise itself largely a statutory violation, including, obviously, what the plaintiffs were doing. Second, separate and apart from the errors in interpreting the statute and properly interpreted, there's actually no evidence here that would be sufficient to support a finding of recognized stature for any of the works. And finally, the third point, that the District Court erred in finding willful violations and imposing a maximum $150,000 in statutory damages for each of the works, even works that were not added to the lawsuit until long after the works were whitewashed. Why don't you take the first issue first?  So the errors in construing the statute. First, the District Court ran afoul of two key things that this Court said in its decision in Pallar v. Seymour. One is the admonition that is also, you can find in Supreme Court cases as well, that whatever else you do, courts can't be assessing the merits of works. The second is that, as Pallar says, Vera protects only a, quote, narrow subset, quote, of works and, quote, a very select group of artics. So you're on the downside of a jury verdict. So I take it your argument is that no reasonable jury — With respect, Your Honor, we're not. The jury was advisory. Okay. So — Other findings. I'm sorry. And, in fact, the jury didn't find what the judge found here. There were lots of differences between the findings. Go back to the statutory. Yes. Well, only insofar as the number of works that they found protected. I mean, but they — to the extent that the core of your claim is that the judge failed to recognize that temporary art is not protected, the jury was not persuaded by that either. And the question I have for you is why isn't temporary art protected as long as it reaches a recognized stature? Right. Let me see if I can address — So it seems to me that everything turns on the stature requirement of the statute. So, largely, I agree with you, Your Honor. I'll say — let me see if I can address it quickly. Number one, I don't think we can say the jury wasn't persuaded. I think the judge actually instructed them that temporary works are protected. All right. But in any event, why don't we get to the core of your argument? It's not the core — Are you maintaining today that temporary art cannot have protection? No, no. I don't want the Court to get the impression that that's the core of our argument. Well — The core of our argument — Whether or not it's the core of your argument, is it something you're asking us to address, or are you waiving that part of your argument? I'm not waiving it. I would say that, in a limited sense, okay, the works here are a special kind of temporary in the sense that it's part of a project that involves things going up, staying up for a certain amount of time, being painted over again. You're waiving the objection you had to whether, as a — I'm not going to say categorically. Categorically. There could be — So now we get to stature. Correct. And your argument is that the district judge did not apply the stature standard, correct, at all or correctly? What is it? You know, I think that the Court thought it was applying the stature standard. It said it was. Yes, but as it described it, it wasn't, because — That's an incorrect application, am I right? Yes. All right, let's hear you on that. Okay. So incorrect in several ways. One is in — and the Court said that it relied heavily on the plaintiff's expert. Gave great weight, I think, is the phrase the Court used. This is Supplemental Appendix 31. The plaintiff's expert — remember, this is the person who, before taking on the case, was not familiar with any of these works of supposed recognized stature — And she described what she was doing. She added in other things, also irrelevant ultimately to the statutory question, which were the artist's other works, their backgrounds, reputation. You know, there is a lot here about the importance of the site of five points. And look, the whole genesis of the lawsuit is that they were attempting to save the site. Why aren't all those appropriately considered? I mean, I would think that the stature analysis can be holistic. You start with Mr. Cohn, who has his own status in this area of art. And I know you were concerned about Judge Block's appreciation for this area of art. You can understand that I have little sensitivity for it. Nevertheless, it has its own status, and Mr. Cohn is recognized in this field. I would think that would allow him to offer opinion testimony as to which pieces have stature. And we know that some of the pieces here were put on the five points tour. So that would be another piece of evidence suggesting stature. Third, we have five points status. Now, again, people who aren't sensitive to this might question it, but, you know, if the chip comes from the Parthenon, it's going to have a stature that doesn't come from, you know, a building site on 34th Street. Same way, the artist's reputation. Any squiggle by Picasso is going to have more stature than something that I scribble here today. And then you get the expert who basically, on her quality assessment, corroborates everything all these others have said. You know, stitch it together, why doesn't the judge have the ability to find stature? So a number of things. Put it another way, why were his findings in that clearly erroneous? Well, I think that, you know, there's several things to address here, and I think it's important to distinguish between the standard the judge applied that was erroneous and whether the conclusions could be supported. The standard was erroneous because the focus on merit as independently something that is important is exactly the opposite. I mean, like I said, Pallara says we're not supposed to be assessing merit. I think that's what the judge did. I mean, he talked about Cone's assessment of it and the fact that they were on the five points tour. So let me address that, except to say he said he gave great weight to the expert. The expert testified extensively about that. And there's a temporal aspect to you need something to have achieved recognition before it was destroyed. You have to destroy something that is then of recognized stature. It's not a retrospective we think this is good art. But let me talk about Cone, because obviously that is at the core of what the judge did. I think, first of all, what he had ‑‑ it's not Cone's testimony about this had stature, and what the judge was actually looking at is he said because Cone allowed these to be painted on particular walls and left them up on some walls where stuff stayed up longer than other walls, that that indicated the recognized stature. The problem with that is, I mean, there are a lot of problems with that. One is that he allocates the space before he sees the artwork. It's not ‑‑ so he's making a judgment about the artist, not about the stature when he does that. But if you do that, you have a standard. He assigned them spaces on the wall, but then his decision about whether they remained and for how long they remained was an after‑the‑fact decision. He himself testifies that sometimes someone he allotted the prime walls to was just blowing off steam, and then he had that work painted over. But if you take that as an appropriate way, if Cone's decision to put something on those walls where stuff stayed up somewhat longer, and not permanently, somewhat longer, if his decision to do that, make something of recognized stature, all those things on the walls facing the 7 train were painting over something he previously decided to put there, and it would be under that theory, Vara is saying because he put the previous thing there, that would then be a work of recognized stature. He can't approve painting it over without violating the statute. The artist can't do it. So you would be interpreting the statute in a way that freezes things just by virtue of that, you know, you take a snapshot, and then you can't do anything else because you don't have any kind, unless you have a serious threshold for something actually achieving recognition beyond the fact that. I mean, I think the argument is more clever than persuasive because the statute provides opportunities to remove, replace, whatever, and part of your problem is that you, you know, paint it over without doing any of those things. Your solicitousness for these other artists is, you know, somewhat curious, but the fact is if they wanted to complain, they might have an action, but they might also be satisfied by being told they can come and photograph, they can come and remove, they can come and do whatever the statute provides. Your Honor, with respect, it's not about solicitousness for other artists. It's about interpreting the statute in a way that, and again, Congress has a phrase, recognize stature. They don't describe what it is. Pallara says it's supposed to be narrow, but what, at a minimum, we know that it's supposed to be preserving things for, that deserve longer-term preservation, and in giving content to it, it's not about solicitousness for them. And you're creating a regime where unless somebody is, and I don't think that certainly the aerosol art world works this way, where once something is on a wall, unless you get written consent from the person, then you can't paint the next thing without being at risk. When you say that we're creating a regime, so go back to the plain text of the statute. Correct. I don't create regimes. The courts are not in the business of creating regimes. We've got a text that seems to say what it says, and it says, as you point out, recognize stature. There's not much more to it than that, and certainly in the text. So we look at the dictionary. There are other things that we can look at, but we're not in the business of creating regimes. So if Congress tells us this is the regime, and it has a number of mechanisms pursuant to which a developer like your client can destroy, move, whatever it is, the art, then we are where we are. We're stuck. But I disagree with that, Your Honor, because I agree the court is not in the business of creating regimes, but it would be one thing if Congress said this is the type of thing that's protected, and I was saying you shouldn't do that. Congress has said recognize stature, and the court has to give content to it. Whatever mechanisms there may be for a developer, you would be interpreting the statute. It's not just the developer who's subject to the ability. Why, based on the evidence from Mr. Cohen, from Ms. Vara, and so on, that was available to the judge, was he not entitled to find that some significant number of these visual depictions were of recognized stature? Well, you know, this is getting past the problem of applying the wrong standard on the evidence. Then you're looking at something where he basically almost across the board did it without discrimination, including stuff that had just been put up. Would you agree that any of those works of art fit into the category of having recognized stature, of recognized stature? I wouldn't, because these were all things that were part of a large operation where there were 300 works on the wall at a time. Well, so was the Metropolitan Museum of Art. Well, yes, Your Honor. So tell me specifically what the objection is. Yes, the objection is that there is nothing other than the fact, really, that Cohen had allowed these to be painted on those walls that said that they had achieved recognized stature. And, you know, including as to his own paintings that he put up there, and the court's saying that's enough for that, too. So it was an undiscriminating determination based on a misconception about looking at the merit of the artwork. Wasn't it totally erroneous about all of the findings he made with respect to recognized stature? Well, it was an abuse of discretion as to everything because the standard was completely wrong. I think it was, I mean, so he wasn't applying the right standard, so I think it would have been. Can you remind me, before you sit down, specifically what his error was in the standard he applied? Yeah, the error was that he heavily considered, relied on Ms. Vara, who testified all about merit. Well, as Judge Ragsdale pointed out, there was a range of evidence coming from different sources that he relied on. And what you've essentially done is, I mean, there were robust arguments below, you know, it was well-briefed, well-argued below that these were recognized statutes, those weren't, these were recognized statutes, those weren't. And at the end of the day, he made findings. And so what you've got to convince us is that they were fully erroneous. Right. I mean, look, clearly erroneous. This is not a walkover below Ms. Vara herself. It was hotly contested. We're finding all of these works to be of recognized statute. We're not re-weighing evidence that was argued before the district court judge. Now, I thought from your brief that what your problem with the artistic, with the standard was, was you didn't think the judge was considering whether they attained stature at the time of destruction, that he was relying on the expert and therefore doing a post-talk analysis. That was one of the problems. Part of the problem, what's the other part? The other part is relying on determinations as to the skill and craftsmanship of the works. Isn't that a higher burden for the other side? That is, you know, the Copyright Office says we shouldn't even be engaged in this, and you pointed out at the beginning of your argument that we should not be engaged in this exercise of what's meritorious. So we should look at community standards and so on. But if the burden is to show merit, that seems to be higher than necessary to me. I think it's just different because there's a lot of testimony here about merit, how wonderful these works are. There's practically nothing other than the fact that Cohen had them up there temporarily, about anyone having recognized them for anything at the time. I don't know. I mean, they're part of the tour. So they have been selected among the group for these people who apparently even come from abroad and make this part of their New York experience. I'm troubled by your notion that quality is irrelevant. I understand that judges are not to assess quality, but when you've got someone like Mr. Cohen who says the reason I left it up is because it's attained a stature in this area, you know, he doesn't use the word stature, it's the legal word, and it's on the tour, it's now a recognized area, and then an expert who comes from, you know, what was it, Doyle, one of the auction houses, and says among this work, this would be quality work. I mean, it's corroborative. So first of all, the expert doesn't even say he's able to talk about all of the paintings, right? At some steps, that. The tour is not all of them. Let's not get into the minutia. I don't think it's minutia, though, because what it reflects— Your argument has been repeatedly that he overemphasized this person and that you couldn't consider merit at all, and I am not sure that I am persuaded that you can't consider an expert's view of quality when then you're considering other person's assessments that it deserves to stay up there and that people are coming to see it. I do think the statute would say you cannot consider an expert's assessment of quality. You can consider evidence that at the time people had recognized the work as being of quality. That's different from after-the-fact evidence that this is great work. I understand that, because that's what you're saying. But that is throughout— I'm ignoring all the other evidence, and what I'm saying to you is when there's evidence of contemporary recognition, can't the post hoc recognition confirm it and be added support? I mean, not in any significant way. The question is—I mean, the problem is the judge is asking the wrong question, and the whole analysis is infected by that because he's not focusing on the question of how do you identify these, you know, what's— and again, like, then there's this—you see it also in the Blunderbuss ruling. Everything that went up for a long time, a short time, except for a couple of things, he throws it all in because she's testified, and, you know, they've said, oh, this is— it's about these works prior to their destruction. But if you look at what she referred to, there's almost nothing that's actually— Before you sit down, you spent some not inconsiderable time when you briefed on the notion that temporary works of art are not works that are entitled to recognized statute. Are you still pressing that here? I may not have been clear. What I'm trying to say is that in the particular type of temporary that we're dealing with here, there can be—you can conceive of something that's temporary but achieves stature in that short time. But when you're dealing with a site whose whole operation is we're painting over the stuff after a certain amount of time, then, yeah, presumptively it's not going to be, or people can't paint over things. What's the difference between painting it over and tearing it down? There is no difference from a statutory perspective. I wrote down that you said you waived. I did not. You said the word waiver. If I said the word waiver, it's only to say I'm not waiving. What I'm trying to say is that I am not arguing that nothing temporary could ever achieve recognized statute. But you are arguing that once they get— I am arguing that this— Once they get painted over, that somehow disallows them to— No, no. It's the fact that they are part—that this is all part of a larger operation of, quote, creative destruction where the whole way the place operates is to take these things that if you had taken a snapshot two years earlier, they would have said, those were the work of recognized stature, and so the people who painted over them would be in violation of the statute. How would you handle something like the Christoph Gates that were up in Central Park? Obviously temporary. Someone presumably who was qualified would be able to— who didn't see them up there would be able to look at photographs and make judgments about their quality. There wouldn't be, it seems to me, much of an argument that that wasn't a— Right. And I'm not arguing—right. That would be something— Recognized stature. I don't see how these— Right. And that would be the extraordinary case. That's not this type of—that's why I say this is a particular type of temporary. That achieved, you know, overwhelming attention, third-party recognition, et cetera, that would have achieved stature. But here you've got a situation where if you're going to say that the fact that, you know, Mr. Cohen decided that something was worthy of the wall space, like then that makes it under the statute permanent, can't be destroyed. There are all kinds of galleries that perhaps folks like you and I don't go to that have temporary installations that among the connoisseurs are very important works of art. Right. But I guess—yes. But what I'm saying is that there is no way to rule that these works are of recognized stature by virtue of the fact that Cohen allocated the space for them, they were on the tour, whatever, without effectively holding that any site like this is in constant violation of VERA unless, except by the grace of the artist, not choosing not to sue, or you're getting consent from all of them because if it being there makes it recognized stature, that's true for everybody. Well, but the statute says that if you're going to require removal or destruction or whatever of art, you have to do that up front. So, I mean, the plaintiffs, if they're successful, may get—this may be a case of unintended consequences for them and they may not in the long term like what they get. But we're construing the statute and once—it seems to me you're arguing that the district court was wrong in finding that they had attained stature and that requires you to show clear errors if you're arguing that as a matter of fact he couldn't make that finding, especially since the jury made it, too, as to a large number of the works of art. But you're talking about construing the statute. The statute says recognize stature, but there is a very major component that is a legal decision here, right? Congress didn't say, well, when we say recognize stature, do we mean this much recognition, this much recognition, or this much? Pallara says it's supposed to be narrow, but necessarily you're— but also narrow and a limited class. And by definition, then, in what I think I hear from the court, is a suggestion that— I mean, there's a suggestion that all—it's going to be anything that is on the wall and on the tour. And that's going to be enough. That's not a factual—just a factual decision. There is a statutory construction decision about how big a slice of art works is Congress saying, by statute, it's now permanent and you can't do anything to it. Isn't there a copyrightable issue here? I mean, isn't that a confining or limited— Not very. I mean, because you can have a whole host of works of visual art. There can be millions and millions. And the question is, how many is Vera saying, by statute, cannot be messed with without consent? So we've kept you well, well past your time. We'll hear from the other side.  Thank you. Good morning, Your Honors. Eric Baum from Eisenberg & Baum for the appellee artists. The appellants conceded at trial that the 45 works of art were works of visual art under the definition of Vera. They now try to backdoor an argument that temporary ephemeral art goes to the standard of recognized stature. This not only disregards overwhelming evidence based upon which the advisory jury in the court found recognized stature, but also asked this court to inject a definition of temporary art into the statute where Congress provided none, which would inevitably require this court to commit art censorship through the court's own art interpretation. There is no legal issue that counsel is raising that the art qualifies. The question here is, is it of recognized stature? And they take issue with the court's ruling on recognized stature in this case. The court applied the Carter standard. It looked at a totality of the evidence. You had competing experts. You had an expert, Rene Vara, that was called by the plaintiffs at the time. Do you agree that the assessment of recognized stature has to be at the time of destruction? There is case law that supports. There is the Polaro case. Well, that doesn't answer my question. Do you agree with that? It does not have to. The evidence in this case that the court cited to it said that it relied on most heavily was pre-destruction stature. So that was the main focus of the case. Under what circumstances would it not have to? Under certain circumstances. For example, if you had a newspaper article after the fact where a — Isn't the entire idea to prevent the destruction of something of recognized stature? Yes. So how do you make that assessment unless it's at the time of destruction?  My trouble is when you say in most instances, I can't see any instance where you would make that determination after destruction. In that, you know, Carter did not specifically address that issue. How would it be fair notice to the person who's either taking the work down or destroying it? If it hasn't reached the stature at that moment, I wouldn't know how the person got fair notice that he was acting contrary to law. The grouping of evidence, most, the totality of the evidence really must be pre-destruction stature. So that's your position. The point is you could consider under some circumstance. It's left open in Carter and in Pallera. You could consider some post-destruction evidence. But in this case, that's not what happened. The court relied mostly on pre-destruction stature.  That was the focus of its decision. Your adversary, as I understand, one of his key arguments is that when you have art that can be destroyed by the artist or by someone like Mr. Cohen, at his discretion, how can it possibly be viewed as not destroyable by the landlord? I mean, how does it, if it has achieved the stature, how is Mr. Cohen able to do what he does? Well, what the appellants do is they misstate the record. The understanding at five points, and there's testimony from the artist, that before any art would be painted over, changed, modified, they would get the permission and consent from the artist. There would be notice and permission, and that would happen on occasion. The artist protected their own moral rights. I didn't understand that, for instance, with respect to the less favorable walls, that there was always an agreement before it was done. I thought they went on those walls understanding that it could be painted over the next day. Yes. Okay. So where was it that the artists were given notice for all the walls, for some of the walls? What? Right. So if you just, I think you just addressed it, there was an understanding. So when the artist would come on those rotating walls that you're referring to, which are not where the works of art were in this case, they were on the long-standing walls, there would be the understanding that it would come down. Now I'm trying to figure out how such works ever satisfy the stature standard. Well, we're not claiming that those works satisfy the stature standard. The works in this case, the 45 works, were on the long-standing walls. For example, some of that artwork, Mother Green Earth, was up for seven years. Many of the works were intended to be up for more than a year. So on the long-standing walls in this case contained the 45 works. What you are referring to is other walls that gave some less recognized artists opportunities. But even in those instances, there was an agreement, either at the time they drew the work, created the work, or after to paint over. It was never stepping on someone's rights and just whitewashing something without notice. I understand that someone might paint something, whether on a wall or any place, and all of a sudden, everyone in the art world, in the press, recognizes it as an extraordinary item, and the next thing you know, people are rushing to see it, etc., etc. But that's not quite what went on here. I mean, everything was Mr. Cohen decided it got painted over, or Mr. Cohen decided it didn't get painted over. So how do we say that that kind of singular determination in an area that involves a lot of turnover reaches the level of stature that the statute expects? Well, first of all, Cohen, with the long-standing walls, would never paint over any of the works without the permission of the artist. And when we look at what the requirement of what recognized stature requires, the temporary component of it has no bearing on recognized stature. You know, the mere fact that he always sought permission doesn't mean that the work had stature. He himself says that if, in his view, a recognized artist was given one of these walls and came by and was just blowing off steam, he would have that painted over. So yeah, maybe he called the artist and said it was permissible, but that didn't mean the work had stature. Right, and that's why in this case, we look at a totality of the evidence. And it wasn't just Cohen's determination in this instance. It was Renee Vara who testified extensively, spending over 600 hours researching all the art. It was the two fact witnesses. It was the folios. Wasn't most of her assessment whether, as graffiti, it had artistic value? She wasn't able to testify to whether, at the time of destruction, it had attained a certain stature. She did, actually. She testified that she reviewed voluminous materials as cited in the district court's decision. Social media and so on. Social media, documentary footage, letters from art professors and their syllabi, requests from visitors to come onto the premises. Now if we apply that to each of the works of art that Judge Block found to have attained stature, some of them have very little media attention, or they only have attention because they're on sites that the artist himself put it on. I mean, that doesn't tell us much about how it's perceived of by the art community or even the general public. In each of the instances, Renee Vara, even with those works of art where there were not third-party recognition, such as a newspaper article, Renee Vara corroborated with Cohen's testimony, with Cohen's findings, that these works were of recognized stature. We always had testimony from Renee Vara. We always had testimony from Cohen that these were on his walls. This was part of his collection, his special collection at Five Points. Is it your view that a work of art can obtain the requisite recognized stature entirely by virtue of its placement in a particular museum, say, or in a particular place? Location is an important factor. Here, this was Five Points. We know from the Martin case. It's never dispositive. It's never dispositive. It's a starting point. So if a work of art, for example, is in the Louvre, that would be a significant starting point. It got there for a reason. Here, this was the world's largest open aerosol museum. The works that got on the long standing walls got there for a reason. There was a tremendous amount of tourists coming to the site, teachers, professors, and over time it obtained recognition. So the site is specific as a starting point, but you then must go to the specific work of art. You must look at Carter. You must do the analysis, and there must be recognition under one of those categories. Should I move on to addressing the damages? I've actually got a couple of questions, concerns. So how do you deter nuisance suits? I mean, one of the things that Mr. Federer is talking about is the Parade of Horribles, where every graffiti mural that's painted over or whitewashed is the subject of a suit. That was the discussion. That was a compromise when Vera was passed, and you have the provisions in Vera that provide for a written waiver, a specific written waiver, unlike some of the other countries that belong to the Berne Convention where you can't obtain a waiver under any circumstances. Here, the owner and the artist can enter into that agreement, and you have the notice provisions. In this instance, there was ample opportunity for the owner of this property to provide a 90-day notice, and not even a 90-day notice. I mean, that's the legal requirement. He could have given the artist any notice to protect and preserve their art. From the time of the TRO until the building ultimately came down months later, he blocked access to the building. He wouldn't let the artist in. Multiple artists testified they would be arrested if they went onto the property. Had they been given some notice, many of these pieces were movable. I can give you multiple examples of that as I stand here. To that issue, the work wouldn't then be temporary because it could be removed and it could be placed somewhere else. How many of the 45 fell into that category? Off the top of my head, I'm not sure. I could give you a handful of examples. Now, I would say there are at least a dozen, maybe more, could have been removed in whole or in part. And what's also important, that's just pieces that we know you can take that are on a removable piece. Had the artist been given an opportunity to protect their moral rights, that is to go in and assess the walls, it could have very well been that a lot more could have been done. They could have removed parts of the wall. In today's world, it's not uncommon to remove a part of a wall and preserve it. Or maybe to preserve their moral rights, they wanted to take a photograph or say goodbye to the photo. They were completely denied that opportunity as an intentional act by Wolkoff to prevent them from exercising any of their rights. Help me understand how that works in a context like this. Let's say there is wall art on an abandoned building in, you know, somewhere in New York. Building changes hands. The new owner wants to do what the defendant here did, which is tear the building down and build something else. Let's say also that the work is by someone of recognized statute. Unless I get, would my rights in that, if I were the artist, would my rights in that piece of artwork be entitled to any protection? I'm sorry, would they not have protection? Is that the question? Would they? So the operative question that I would just ask the court is, was that work put up by permission or without permission? Without permission. Without permission. So without permission, that would be a different case. That is not the scenario here. Right. So under that scenario, there likely would be no protection. There hasn't been an absolute conclusive finding throughout all the districts on the issue. But I think a very fair interpretation of the cases that are out there is there would be no protection. What is the language in 106A that tells me that? 113. Or is it 113? Okay. 113. Pull it up. So I believe that the statute, when you look at it, it doesn't address the issue of permission. That's not going to be in the statute. Recognized stature. It's recognized stature. But the issue of permission is not directly in the statute. But I do want to just make sure that we're clear. This was over a decade worth of permission, in this case, by the owner of the property to pay on the law. The bill was just part of his hypothetical. I'm trying to understand what the statute covers and what it doesn't. So I recognize stature. I put something up on a wall in an abandoned building. The building changes hands. It's destroyed. What am I, as the artist, entitled to? So my personal opinion, without permission, that there would not be protection. And with protection, my rights accompany the transfer. Correct. That's just my opinion. There hasn't been a specific finding. I understand. Okay. Because this, I mean, the statute just is about recognized stature. Correct. So I could go, well, not me, but someone could go and paint something, and a whole host of people show up and think it's a great work of art, and it's right on this building. But history shows that that doesn't really happen. I mean, we don't see an increase in litigation trends. The Copyright Office conducted a study on this particular issue and looked at European countries that belonged to the Berne Convention that had moral rights statutes in place. And there wasn't an increase in litigation. And likewise, the legislative history, the House report indicates that of the 11 states that had moral rights-type statutes on the books at the time that VARO was issued, there hasn't been an increase in trends. So we don't see that trend. That is not this case, and that is a different issue. Is there a copyright limitation? Why isn't painting over of the statutes, I'm sorry, of the pictures on the walls that are not devoted to permanent collections, why doesn't that violate the statute? I'm sorry, say that one more time. Why doesn't Mr. Cohen's routine painting over of statues that aren't in the main collection, where the 45 are, why didn't that violate the statute? Because he wasn't painting, the walls you're referring to are the rotating walls, where he gave the younger artists, the less experienced artists, an opportunity to paint. But for those that made his collection on the walls that could be seen by the public, many of those, most of those remained unchanged. One of them I referred to before, Green Mother Earth, was up for over seven years. And the intention and the discussions with Cohen at the time was that they would remain up for years and wouldn't come down unless there was some discussion between the artist and Cohen about it. I put something up on the rotating walls, and Mr. Cohen and I have a disagreement as to the quality. This is high quality. I'm an artist of recognized stature, and then he paints it over. Do I have a claim under this statute against you? You might have a claim under that statute, but that is not the etiquette and that was not the rules that were followed at Five Points. That didn't happen. There was a set of rules where there would always be notice and permission to an artist before paintings, works were painted over. On all of them. On all of them. Now, it might be, as Your Honor had indicated previously, that it might have been up front. Cohen might have said, well, you can paint on the wall, but just so you know, tomorrow it's going to be coming down on a rotating wall. So that understanding was always had. It might have been before or after. The statute requires it in writing, and I gather none of this was ever in writing. No. Okay. All right. Thank you very much. Thank you. First of all, to the point that Judge Radji just raised, counsel said that he would always get permission before. The record doesn't reflect that. I think it is true. There was an understanding, and many of the artists testified, that he could always have stuff painted over, including on the longstanding walls. But the point about it not being in writing is the key one. As you're saying, it has to be in writing to comply with the statute. So, for instance, the — If I remember correctly, there is evidence of him sometimes, if not always, giving notice to the artist that it was going to be painted over. I don't remember permission. Right. Sometimes. But even notice, again, under Vera. So there are some significant number of these were painted in 2013 on the so-called longstanding walls. Longstanding walls, just to be clear, is a relative term. They weren't permanent. Those things were painted over things that until then were on the longstanding walls, and under this theory would have been works of recognized stature, the same way that these were, because Cohen had put them there without any — Like being in a gallery and rotating, or being in a museum and, you know, being on — The reason it's not — Rehanging their pictures. The reason it's not is because they don't rehang. The place operates by painting over and destroying the works, so that their interpretation of the statute is one where it's a violation, where they don't have written waivers. And then they're saying it's okay for us, but if it's a violation under Vera, it's a violation both ways. I'm not sure how that helps you, because it would just suggest that there were violations that, you know, aren't part of this lawsuit, but that doesn't necessarily mean your conduct is a violation. Right. The way it helps me, Your Honor, I think, is that it's an illustration that it doesn't actually make sense to interpret the statute as having that low a threshold of recognized stature. Parade of horribles. But, I mean, parade of horribles is sort of a pejorative term, but there's a reason — What a needed pejorative. Yeah, there's a reason we have that kind of reasoning. Would you agree that Carter is a reasonable explication of the statute? No, Your Honor, because — In what respect do you think Carter is? It leads to the extent that, I mean, you can interpret it as being reasonable in the sense that if you interpret it as references to quality being about determining whether it was recognized for its quality at the time, if you interpret it the way that it was interpreted in this case, so that the merit itself — Well, just take the test per se and not necessarily the application. No, no, but I'm saying, so the test, as Judge Block applied it or interpreted it, was merit itself apart not what's recognized as meritorious then, but merit — is the work meritorious? If you interpret it that way, it's not a reasonable explication. So if he had found or asked the question, was the work meritorious at the time of destruction? Recognized as meritorious. Recognized as — well, set aside, did it have stature at the time of destruction? That's part of it, right? I think you can only look at stature through the prism of recognition for the statute. Ah, okay. So you don't think that it's one holistic — I don't think it's a separate requirement. You don't — if it's recognized as having stature — And that's your problem? A defendant couldn't say it didn't really have stature. If it had recognized stature, it had recognized stature. So you can't disentangle stature and recognize. Yes, that is what I think the statute says. Okay, that's fair enough. If I could just very quickly — two other things. I forgot to mention for the tours that were referred to. Those were all for the — the reason they were tours was for the inside works that people couldn't readily see. Not that these specific works on the outside. And even for the inside works, there wasn't evidence that they were going to see specifically these works. They said, we want to see the stuff inside. We want to see the works by particular artists. The — finally, in terms of being denied an opportunity to even take pictures, Judge Block at the P.I. hearing said, I'm going to let him do this. Take pictures if you want to take pictures because it's going to come down once the — the order issues. And they didn't. They were not denied an opportunity to take pictures. Thank you. But he painted over that very evening. Didn't he paint them over immediately after Judge Block said that? Yes. What Judge Block said was, between now and the time when my order issues, take pictures. He didn't issue the order that day. But your — He left — there was time. Your client went and ran out that night and painted over everything. Your Honor, I mean, I think it's not uncommon after a T.R.O. is vacated or P.I. is vacated that parties go ahead and act on the thing that had previously been enjoined. But that very night. Huh? That very night. Wasn't that very night? That very night of — The order. It may have been. It may have been. But my point is simply that he said, my order isn't going to issue right away, so you have time to do it before the order issues, because once it issues, this is going to happen. It seems to me that's a little disingenuous. Judge Block made a claim that they were going to be allowed to go forward with their building plan, which there was reason to think was not going to be that quickly because they needed certain permits, et cetera. And so he was telling them, you know, the artists, go ahead and start making plans. Nobody envisioned that within 24 hours the art would cease to exist. All I'm saying is the way — And that's a concern with respect to the damages that got awarded against your client. Okay. Although on that, remember, the majority of the works here that he ordered the maximums for all of them were not in the case at the time, right? Okay. So it was just across the board he said this was willful as to the 24 — it was 17 works that are part of this now that were in the case then, then 28 of them weren't even in the case, but Judge Block then said it was willful on maximum damages for those two. Thank you very much. We'll reserve decision.